IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF NEW YORK

Jane Doe 1, Jane Doe 2,

                Plaintiffs,

v.

The Congregation of the Sacred Hearts of Jesus
and Mary, Diocese of Fall River, Sisters of
Charity of Montreal ("Grey Nuns"), Sisters of
Charity of Quebec ("Grey Nuns"), Missionary
Oblates of Mary Immaculate Eastern Province
(the "Oblates"), and Black and White
Corporations 1-10,

                Defendants.

**COMPLAINT & JURY DEMAND**

**Civil Action No.  23-5294**

## I.   <u>NATURE OF CLAIMS</u>

1.   This case is brought under the New York Child Victims Act (L. 2019, ch. 11) ("CVA"), New York Law.[1]

2.   Plaintiffs Jane Doe 1 and Jane Doe 2 (together referred to as "Plaintiffs"), were unlawfully and continuously subjected to ***hundreds*** of sexual offenses—including sexual intercourse, oral sex, fondling, and forced sexual touching in New York—while elementary-aged boarding school students.

3.   Jane Doe 1 was six (6) years old when the abuse began in 1964, and Jane Doe 2 was five (5) years old; the abuse continued until Plaintiffs were removed from Sacred Hearts Academy in 1970.  Plaintiffs are sisters.

4.   The acts defined herein constitute sexual offenses as defined by New York Penal Law Article 130.

5.   Defendant's agents committed and conspired to commit heinous and continuous acts of child sexual abuse against Jane Does taking them directly from their home in New York, often picked up and driven by the Defendants employees and agents, to other locations in New York, and other states.

6.   The events described herein shock the conscience; child sexual abuse can only occur on this systemic level due to the intentional misconduct, coverup, and gross negligence of Defendants' leaders and employees.

## II.   <u>PARTIES, JURISDICTION & VENUE</u>

---

[1] Similar abuse also occurred in Maine, and any related claims are also timely under as the acts constituted "sexual acts" as defined in Maine Revised statutes Title 17-A, section 251, subsection 1, paragraph C or "sexual contact" as defined in Maine Revised Statutes Title 17-A, section 251, subsection 1, paragraph D.

7.      Plaintiffs incorporate all prior paragraphs of this Complaint as if fully set forth herein.

8.      Jane Doe 1 and Jane Doe 2 were residents of and domiciled in the State of New York when the acts of sexual abuse and violence were committed against them.

9.      Today, Jane Doe 1 is a citizen of New York, and Jane Doe 2 is a citizen of Georgia.

10.     Defendant Diocese of Fall River is a citizen of Massachusetts and maintains its primary place of business in the State of Massachusetts.

11.     Defendant Congregation of the Sacred Hearts of Jesus and Mary ("Congregation of Sacred Hearts" also "Sacred Hearts nuns" and "Sacred Hearts priests") is a citizen of Massachusetts and maintains its primary place of business in the State of Massachusetts.

12.     Defendants Sisters of Charity of Montreal and Sisters of Charity of Quebec (together the "Grey Nuns") is a foreign citizen of Canada and maintains its principal place of business in Canada.

13.     Defendant Missionary Oblates of Mary Immaculate Eastern Province (the "Oblates") is a citizen of and maintains its primary place of business in the District of Columbia.

14.     On information and belief, all Defendants are being sued under either their true name or common/assumed names. In the event any parties are misnamed or are not included herein, it is Plaintiffs' contention that such was a "misidentification," "misnomer," and amendment relating back to the original filing, pursuant to Federal Rule of Civil Procedure 15, should be allowed in interest of justice.

15.     Plaintiffs were damaged far in excess of $75,000 by Defendants' tortious conduct.

16.     During the time period when the abuse described herein occurred, Jane Doe 1 and Jane Doe 2 were minors, domiciled in the State of New York their parents.

17.     The Fall River Diocese and Congregation of Sacred Hearts purposely availed itself to the

citizens of New York by intentionally targeting and enrolling boarding students from the State of

New York, as evidenced by this excerpt from the *Fairhaven Star* (October 22, 1936):



18.     Upon information and belief, Plaintiffs' mother viewed leaflets and advertisements similar

to below, in which the Fall River Diocese and Congregation of the Sacred Hearts represented

Sacred Hearts Academy as a proper boarding school for citizens of New York, including minor

Plaintiffs.

19.     The advertisements Plaintiffs' mother viewed were similar to the below, excerpted from

an August 1957 publication of The Diocese of Fall River's "Official Publication," *The Anchor*:




20.     An article in the *Catholic Messenger* described the "esteem in which Sacred Hearts

Academy [was] held throughout the country:"[2]

> Keen observers state that the school has a tradition of thoroughness and depth in scholarship, and is remarkable for the poise, quiet steadiness and solid piety which dignity, high ideals, fearlessness, it imparts to its students. The atmosphere of the school is home-like and affectionate, making the pupils feel that they are children of the houses.

21.   The Fall River Diocese also publicly touted the "Good Citizenship Awards" its students regularly received and the school's "top 10 scholastic ratings in the United States."[3]

22.   Only after viewing promotional material from the Fall River Diocese and the Congregation of the Sacred Hearts, Plaintiffs' mother removed her daughters from St. Vincent De Paul—a Catholic school in Tarry Town, New York—and sent them to board at Sacred Hearts Academy in Fairhaven, Massachusetts.

23.   The Diocese of Fall River also purposely availed itself to the State of New York as its leaders knew, or should have known, that its clergy members—including Father Porter—routinely accompanied minors entrusted in its care on retreats and weekend trips; upon information and belief, many of these retreats and weekend trips occurred in the state of New York.

24.   The Oblates owned and operated retreat homes, parishes, and seminaries in Newburgh, New York and Essex, New York, where Plaintiffs were sexually abused by Oblate priests, and other clergy members.

25.   The Oblates owned and operated retreat homes, parishes, and seminaries in Bucksport, Maine, and Bar Harbor, Maine, where Plaintiffs were sexually abused by Oblate priests, and other clergy members.

26.   Priests under the Oblates' direction and control were also intentionally shuffled around New York—where Plaintiffs were also sexually abused by Oblate priests, and other clergy

---

[2] *See* Exhibit 1.
[3] *Id.*

members. By way of example of the Oblates' movements, in 1942, *The Plattsburgh Daily Press* reported:



Transfers of Oblates of Mary Immaculate in the First American Province, Lowell, Mass., affecting members of the order in various parts of the country, were announced yesterday.

Rev. Edward F. Talbot has been transferred from Washington, D.C. to Newburgh, N.Y.

Rev. William Collins, newly ordained, also to Newburgh.

Rev. Charles Leonard, from the Dontenwill Novitiate at Essex, to Buffalo.

Rev. Joseph M. Supply, from Newburgh, N.Y., to Washington, D.C.

Rev. Joseph Bollard from Douglas, Ga., to Newburgh.

Several of the priests listed are well known in this area, having vacationed at the O.M.I. house at Essex on various occasions.

27.    In 1960, the *Lowell Sun* reported "Transfers Announced for 28 Franco-American Oblate Priests" to/from New York, Massachusetts, Maine, Connecticut, Rhode Island, New Hampshire, and Vermont.[4]

28.    In 1961, the *Lowell Sun* reported "54 Changes of Personnel in Eastern Province of Oblates."[5]

29.    Oblate priests from New York, Maine, and other areas of the country often congregated in Massachusetts along with Grey Nuns, priests under the Fall River Diocese, and priests and nuns under the Congregation of the Sacred Hearts to attend funerals and religious ceremonies.[6]

30.    Oblate priests, Grey Nuns, priests under the Fall River Diocese, and priests and nuns under the Congregation of the Sacred Hearts also traveled from Massachusetts to attend funerals and religious ceremonies in New York, Maine, Connecticut, Rhode Island, New Hampshire, and Vermont; upon information and belief, Plaintiffs were often transported by Defendants' employees and agents to these events and sexually abused by Defendants' employees and agents on

---

[4] *See* Exhibit 2
[5] *Id.*
[6] *Id.*

Defendants' premises.[7]

31.     The Oblates are estopped from raising a statute of limitations defense in New York because they fraudulently concealed and covered up acts of child sexual abuse committed in the State of New York; Plaintiffs can also file a lawsuit to seek redress for the sexual abuse they were subjected to as children in the state of Maine against the Oblates—and all other Defendants—therefore, they are not prejudiced by being added to this lawsuit.[8]

32.     The Grey Nuns purposefully availed themselves to the citizens of New York by unlawfully transporting, kidnapping, and conspiring with clergy under the Fall River Diocese, the Congregation of the Sacred Hearts, and the Oblates to unlawfully transport and kidnap Plaintiffs from their boarding school in Fairhaven, Massachusetts across state lines to orphanages, private residences, clergy-owned retreat homes, and seminaries in New York and Maine, where the Grey Nuns directly participated in and covered up acts of sexual abuse Jane Doe 1 and Jane Doe 2.

33.     The Grey Nuns also operated orphanages, schools, and hospitals in New York and Maine— including an orphanage in Lewiston, Maine where many minors were abused.[9]

34.     Venue is proper pursuant to 28 U.S.C. 1391(b) in that all or a substantial part of the events or omissions forming the basis of these claims occurred in the State of New York, which is within the jurisdiction of this Court.

## III.     FACTUAL ALLEGATIONS

35.     The facts alleged herein show Defendants committed and conspired to commit heinous and continuous acts of child sexual abuse against Jane Doe 1 and Jane Doe 2 in the State of New York,

---

[7] *Id.*
[8] In June 2021, the state of Maine lifted the statute of limitations, enabling anyone who has experienced childhood sexual abuse in Maine to file a civil claim against their perpetrator, no matter how long ago the abuse occurred. *See* Me. Rev. Stat. tit. 14, § 752-C. *See* Exhibit 3.
[9] *See* Exhibit 4.

while transporting Plaintiffs to/from New York, and continuing in the states of Maine and Massachusetts, among other states.

### A. Plaintiffs Were Born, Raised, and Sent to Sacred Hearts Academy From Their Permanent Home in Brooklyn, New York.

36.     Jane Doe 1 and Jane Doe 2 were born in Brooklyn, New York to a tightly-knit family of Cuban immigrants.

37.     Although Plaintiffs' family did not come from great financial means, they were surrounded by love and support during their first years of life in New York.

38.     Plaintiffs recall many happy memories from their early childhood—celebrating holidays, gathering for family events, and spending time at the park with their mother.

39.     Plaintiffs' mother adamantly believed in investing in her daughters' education, and she did everything in her power to send Jane Doe 1 and Jane Doe 2 to the best schools possible.

40.     Before attending Sacred Hearts Academy, Jane Doe 1 and Jane Doe 2 attended St. Vincent De Paul—a Catholic school in Tarry Town, New York—for one year.

41.     When Plaintiffs' mother received promotional material from the Fall River Diocese that boasted of one of its boarding schools that promised to provide a homelike atmosphere, rigorous academics and promised to impart students with "poise, quiet steadiness . . . solid piety . . . dignity, high ideals, fearlessness," she was convinced her daughters would receive an elite Catholic education.[10]

42.     Consequently, Plaintiffs' mother removed her daughters from St. Vincent De Paul and enrolled them in Sacred Hearts Academy in Fairhaven, Massachusetts, entrusting they would be properly supervised by Defendants' spiritual guides and educators.

43.     Because Plaintiffs' family did not own a car—Plaintiffs' mother did not even own a

---

[10] *See* Exhibit 1.

driver's license—Plaintiffs were transported to/from their home in Brooklyn, New York to/from Sacred Hearts Academy in Fairhaven, Massachusetts by nuns and priests under Defendants' direction and control.

44.    Immediately after Plaintiffs arrived at Sacred Hearts Academy, they were subjected to their mother's—and every mother's—worst nightmare imaginable.

45.    Jane Doe 1 and Jane Doe 2 were sexually molested hundreds of times on Defendants' premises and by clergy members under Defendants' direction and control; Jane Doe 1 estimates they were taken to at least 30 to 40 locations of abuse.

**B.   Plaintiffs Were Transported to and Sexually Abused at Seminaries in New York.**

46.    Jane Doe 1 and Jane Doe 2 were taken to the Oblates' Seminary and Mission House in Essex, New York on weekend trips by Sacred Hearts Nuns and Grey Nuns at least ten (10) times.[11]

47.    Both Jane Doe 1 and Jane Doe 2 recall being forced to kneel and pray in front of the statute at Our Lady of Hope Shrine, in Essex, New York.

48.    Jane Doe 1 and Jane Doe 2 recall a "novice" Sacred Hearts Nun named Lori drove them to Essex, New York on many of these occasions, along with other Sacred Heart Nuns and Grey Nuns.

49.    Jane Doe 1 recalls Lori and the other nuns would take Jane Doe 1 and Jane Doe 2 to one of the seminary's cafeterias or a chapel; sometimes other children—who Jane Doe 1 and Jane Doe 2 did not know—were also present.

50.    By way of example, Jane Doe 1 recalls a young girl was present during one weekend trip during which Plaintiffs were sexually abused.

51.    Jane Doe 1 and Jane Doe 2 recall a sense of dread when the priests entered; once the priests entered, the Sacred Hearts Nuns and Grey Nuns present would leave and pray elsewhere.

---

[11] *See* Exhibit 2.

52.     From there, Jane Doe 1 and Jane Doe 2 were taken to a private room. Although there were other priests involved, Jane Doe 1 and Jane Doe 2 recall Arthur Craig was one of the Oblate priests who sexually molested them in Essex, New York.[12]

53.     Arthur Craig was present the day the girls almost drowned, although no sexual abuse occurred on this day because the girls' clothes were soaking wet—which enraged the Sacred Hearts Nuns and Grey Nuns present; Jane Doe 1 and Jane Doe 2 recall they were made to kneel for hours in front of the statute as punishment.

54.     Upon information and belief, Arthur Craig sexually abused Jane Doe 1 and Jane Doe 2, beginning when Jane Doe 1 was approximately ten (10) years old, and Jane Doe 2 was approximately eight (8) years old; the sexual abuse with Arthur Craig included oral and vaginal penetration. Both Jane Doe 1 and Jane Doe 2 recall Arthur Craig's piercing eyes, and he was aggressive but not as violent as some of the other priests.

55.     Jane Doe 1 and Jane Doe 2 were also driven by Sacred Hearts Nuns and Grey Nuns to Newburgh, New York at least ten (10) times and hand delivered to Oblate priests in a similar fashion as described above.

### C.  Plaintiffs Were Transported to and Sexually Abused at Clergy-Owned Residences in New York.

56.     Upon information and belief, Jane Doe 1 and Jane Doe 2 were sexually abused by Father Porter under the Fall River Diocese at private residences and clergy-owned retreat homes in New York, in addition to the locations in Fairhaven described herein; the abuse included violent sexual touching, groping, and penetration.[13]

57.     Upon information and belief, Plaintiffs were also repeatedly sexually assaulted by priests

---

[12] *See* Exhibit 2.
[13] *See* Exhibit 5.

under the Congregation of the Sacred Hearts, including Frederick Fury and Raymond Mahoney, at private residences and clergy-owned retreat homes in New York; the abuse included violent sexual touching, groping, and penetration.[14]

58.    On many of the weekend trips, Jane Doe 1 recalls she was made to wear the same navy dress:

### D. Plaintiffs Were Transported to and Sexually Abused at Seminaries in Maine.

59.    Jane Doe 1 and Jane Doe 2 were also by Sacred Hearts Nuns and Grey Nuns to an Oblate Seminary in Bucksport, Maine approximately five (5) to ten (10) times.[15]

60.    Upon information and belief, Alphonse Breault was one of the worst predators that sexually molested Jane Doe 1 and Jane Doe 2 in Bucksport. Jane Doe 1 remembers Alphonse Breault would try to act "fatherly" towards the girls and take them on walks outside around the premises.

61.    Then, Alphonse Breault would isolate the girls one-on-one; Jane Doe 1 recalls when she saw Alphonse Breault take Jane Doe 2 alone, she would often try to replace Jane Doe 2 and offer herself instead, but she was not always successful. Once Alphonse Breault had Jane Doe 1 or Jane Doe 2 alone, he would force them to perform oral sex and other sex acts on him.

### E. Plaintiffs Were Transported to and Sexually Abused at Many Other Known—and Unknown—Locations in New York, Maine, Massachusetts, Connecticut, Rhode Island, New Hampshire, and Vermont.

62.    Jane Doe 1 and Jane Doe 2 were also sexually abused at many other known and unknown locations in New York, Maine, Massachusetts, Connecticut, Rhode Island, New Hampshire, and Vermont.

63.    Jane Doe 1 estimates she and Jane Doe 2, were taken to 30 to 40 different abuse locations.

---

[14] *Id.*
[15] *See* Exhibit 2.

64.     Upon information and belief, Jane Doe 1 and Jane Doe 2 were sexually abuse by priests under the Diocese of Fall River, the Congregation of Sacred Hearts, and the Oblates in Fairhaven, Massachusetts—including on the premises of Sacred Hearts Academy, St. Joseph's Orphanage, and The Provincial House.

65.     In addition to hand delivering Jane Doe 1 and Jane Doe 2 to pedophile priests, Grey Nuns and Sacred Hearts Nuns were also directly involved in the incidents of abuse—shoving crucifixes into their vaginas as punishment and "sewing" the girls' bodies back together after the incidents of abuse.

### F.  Defendants Controlled the Premises and Perpetrators Responsible for Plaintiffs' Abuse.

#### i.     The Fall River Diocese

66.     Along with Defendant Congregation of the Sacred Hearts, the Fall River Diocese controlled Sacred Hearts Academy—in addition to orphanages and parishes, where Plaintiffs were subjected to repeated child sexual abuse.

67.     In 1910, Fall River Bishop Feehan purchased "200 rods of land," to build Sacred Hearts Academy, along with a rectory, and a novitiate.[16]

68.     In 1911, Bishop Feehan "dedicated" Sacred Hearts Academy during a private ceremony, after a "new building" and addition to Sacred Hearts Academy was designed which purposefully included a kitchen, bath, and recreation rooms in the basement, and a rectory on the first floor.

69.     On information and belief, many incidents of child sex abuse occurred in this specially designed basement and rectory, which was purchased, designed, and blessed by Fall River's

---

[16] *See* Exhibit 5.

Bishop—the Diocese's highest leader.

70.     Upon information and belief, Plaintiffs were sexually assaulted by priests under the control of the Fall River Diocese, including Father Porter, a known pedophile and sexual predator, who admitted to molesting over 100 young girls and boys at parishes and schools throughout the country.

71.     Plaintiffs recall Father Porter would fill in for Father Carroll—the head priest at Sacred Hearts Academy—and other priests under the Congregation of Sacred Hearts assigned to perform mass, confessional, and other religious events at Sacred Hearts Academy.

72.     On information and belief, the Porter family owned a residence on Main Street in Fairhaven, Massachusetts—just a few houses away from Sacred Hearts Academy.

73.     The Fall River Diocese had notice Father Porter was a pedophile—before and during the time in which Plaintiffs were enrolled at Sacred Hearts Academy from 1964 to 1970.

74.     By 1963, Fall River Diocese's Chancellor, Father Humberto Medeiros, had received complaints from parents at Father Porter's first assignment, St. Mary's Church in North Attleborough; instead of removing Father Porter from ministry, Chancellor Medeiros moved Father Porter to Sacred Heart Parish in Fall River, Massachusetts.

75.     Jane Doe 1 recalls that very soon after arriving to Fairhaven, Massachusetts in 1964, "James R. Porter, took her to the basement and forced anal sex on her."[17]

76.     Jane Doe 1 and Jane Doe 2 vividly remember bright lights and the flash of cameras blinding them after Father Porter and other pedophiles took photographs of their naked bodies.[18]

77.     Father Porter would take both Jane Doe 1 and Jane Doe 2 on the weekends and proceed to

---

[17] Jimmy Breslin, Chapter 7, *The Church That Forgot Christ*, Free Press, January 11, 2014, p. 79-88.
[18] *Id.*

rape, digitally penetrate, and mandate the young girls performed oral sex on him; other times, Father Porter brought Jane Doe 1 and Jane Doe 2 to St. Joseph Orphanage to give other men oral sex while Father Porter watched; Father Porter called this a consequence for the girls' "bad behavior*." Id.*

78.     Upon information and belief, Father Porter also brought Plaintiffs to private residences and clergy-owned retreat homes in New York, where Father Porter and other clergy members directly participated in and conspired to sexually abuse Plaintiffs, and to coverup the sexual abuse thereafter.

79.     Jane Doe 1 vividly remembers "pain and fighting but she was held down. '[She] was always held down'" by Sacred Hearts Nuns and the Grey Nuns who were present.[19]

80.     Plaintiffs were told by Sisters of the Congregation of the Sacred Hearts they needed to succumb to Father Porter's sexual abuse because their mother had not submitted timely tuition payments.

### ii.     The Congregation of the Sacred Hearts

81.     Defendant Congregation of the Sacred Hearts of Jesus and Mary exercised ownership and control over the premises of Sacred Hearts Academy and The Provincial House in Fairhaven, Massachusetts where Plaintiffs were sexually abused.

82.     The Congregation of the Sacred Hearts[20] also controlled the Sacred Hearts priests and nuns named herein.[21]

---

[19] *Id.*
[20] In Latin: *Congregatio Sacrorum Cordium Iesu et Mariæ necnon adorationis perpetuæ Ss. Sacramenti altaris*; abbreviated SS.CC. See also Jane Doe's redacted report card, attached as Exhibit 5.
[21] The *Congregation of the Sacred Hearts* of Jesus and Mary is a community of some 1500 Brothers and Sisters who

83.     The Congregation of the Sacred Hearts had control over Father William Carroll ("Father Carroll"), the head priest at Sacred Heart Academy, who allowed Defendants to commit rampant acts of child sex abuse against Plaintiffs and other minors in his care.

84.     Upon information and belief, Father Carroll knew Plaintiffs were being horribly sexually abused by Father Porter and the other predatory priests named herein.

85.     Jane Doe 1 recalls Father Carroll would often scold her and tell her she was a very bad girl and needed to pray for her many sins.

86.     Father Carroll would also summon the nuns and a local doctor—the father of one of Jane Doe 1's classmates—to provide medicine and stitches, as necessary, after the incidents of sexual abuse.

87.     Upon information and belief, Father Carroll and Mother Superior, the head Sacred Hearts nun at the Academy, would allow Plaintiffs to remain in bed on Mondays after they returned from weekends of horrible sexual abuse in New York, Maine, and other states.

88.     Plaintiffs were also repeatedly sexually assaulted by priests under the control of the Congregation of the Sacred Hearts, including Father Frederick Fury ("Father Fury") and Father Raymond Mahoney ("Father Mahoney"), at Sacred Hearts Academy, St. Joseph's Orphanage, and The Provincial House in Fairhaven, Massachusetts, as well as at private residences and clergy-owned retreat homes in New York.[22]

89.     Nuns under the direction and control of the Congregation of the Sacred Hearts also directly committed and furthered acts of sexual abuse and violence against Plaintiffs.

---

are present in more than 30 countries. The SS.CC. family also includes a Lay Branch associated with the Congregation. One of the best known members of our SS.CC. family is St Damien de Veuster, apostle of leprosy patients on the island of Molokai in Hawaii (retrieved from: https://www.sacred-hearts.net/congregation).
[22] *See* Exhibit 5.

90.     Sister Ursula regularly injected Jane Doe 1 and Jane Doe 2 with Benadryl medicine to relax and sedate the girls before and after the incidents of abuse.

91.     Sister Mary Felix regularly violated Jane Doe 1 and Jane Doe 2 by shoving a crucifix into their vaginas as a form of punishment.

92.     In addition to the sexual abuse suffered by Jane Doe 1 and Jane Doe 2, they were also subjected to heinous forms of physical and mental abuse; by way of example, Mother Moffet told Jane Doe 1 and Jane Doe 2 that they "had the devil in [them]," and encouraged Sister Mary Felix and Sister Ursula to subject Jane Doe 1 and Jane Doe 2 to 200-step punishments, wherein the girls would be forced to walk 200 steps outside in the dark.[23]

93.     Jane Doe 1 and Jane Doe 2 were also subjected to other physical punishments, such as being forced to stand outside in the cold in their pajamas until they repented for their "sins."

94.     The nuns named herein had direct knowledge of the atrocities Jane Doe 1 and Jane Doe 2 endured, yet they directly participated in or stood by idly. In turning a blind eye, they were complicit in the cruelties that took place and conspired the priests and other pedophiles to coverup child sex abuse on a systemic level.

95.     After Jane Doe 1 and Jane Doe 2 were sexually violated, the girls would not receive help or care; instead, a nun would "sew up the rips," referring to injuries suffered at the hands of the priests and other pedophiles.[24]

96.     During one incident of abuse involving Andrea Randolph, Plaintiffs' dear friend and the only other black student who boarded with Plaintiffs, Andrea was crying, so to get her quiet, one

---

[23] *See* Breslin, *supra* n. 16.
[24] *Id.*

of the Nuns smacked Andrea and bashed her head against a post, leaving her with severe injuries that led to her death.[25]

97.     After witnessing their dear friend Andrea's murder, Plaintiffs were deeply traumatized; Jane Doe 1 became very ill and was likely experiencing a catatonic state of shock.

98.     The Sacred Heart nuns informed Jane Doe 1's family she was ill with rheumatic fever, and they transported Jane Doe 1 back to her mother's home in Brooklyn, New York, where she remained for several months to recover.

99.     Thereafter, the Sacred Heart nuns told Jane Doe 1's mother Jane Doe 1 needed to make-up the coursework she had missed.

100.    Jane Doe 1 was then driven from her family's home in Brooklyn, New York by the Sacred Heart nuns and brought to Maine, where she was left at the home of a merchant named "Ralph," who frequented St. Joseph's Orphanage as well.

101.    Jane Doe 1 was informed by the nuns that Ralph would instruct Jane Doe 1 in the subjects she missed when she was ill.

102.    Once in Maine, Jane Doe 1 was held captive in Ralph's attic and repeatedly sexually abused by Ralph throughout the summer.

### iii.     The Oblates

103.    Plaintiffs were also sexually assaulted by priests under the control of the Oblates, including Father Arthur Craig and Father Alphonse Breault—among others—at seminaries and retreat homes owned by the Oblates—including locations in Essex, New York; Newburgh, New York;

---

[25] *Id.*

Bucksport, Maine; and Bar Harbor, Maine.[26]

104.   Upon information and belief, the Oblates were aware Father Craig and Father Breault were sexual predators before they molested Plaintiffs.

105.   Oblate leaders had knowledge minors were being sexually assaulted at their seminaries; instead of taking action to prevent further abuse, leaders intentionally covered up the incidents of abuse.

106.   Upon information and belief, a minor seminarian student, "T.C.," was sexually assaulted by a member of the Oblates, Father Patrick Hollywood, at the Oblates' seminary in Newburgh, New York in 1965.

107.   After T.C. informed the Newburgh Seminary's "Father Superior," Father McSweeney, that T.C. had been sexually assaulted, instead of removing the priest from ministry and access to children, Father McSweeney intentionally covered up the incident and retaliated against the victim, who was Native American, calling the boy a "savage."

108.   If the Oblates' leaders had taken action to stop pedophile priests under their direction in control at the Newburgh Seminary—as well as other seminaries in New York and Maine—the sexual abuse of Plaintiffs would not have occurred on the Oblates' premises.

### iv.    The Grey Nuns

109.   The Grey Nuns also directly participated in acts of sexual violence against Plaintiffs.

110.   Along with the Fall River Diocese, the Grey Nuns operated St. Joseph's Orphanage, in addition to other schools and parishes, where many of the incidents of sexual abuse occurred.[27]

---

[26] *See* Exhibit 2.
[27] *See* Exhibit 4.

111.     The Grey Nuns had knowledge and participated in acts of child sex abuse before Plaintiffs arrived in Fairhaven, Massachusetts in 1964.

112.     Upon information and belief, minor orphans were being sexually abused by the Grey Nuns and transported by the Grey Nuns to orphanages, private residences, clergy-owned retreat homes, and seminary locations—where Jane Doe 1 and Jane Doe 2 were sexually abused—dating back to at least 1930.[28]

113.     The Grey Nuns also controlled and operated an orphanage in Lewiston, Maine, where minors were subjected to horrible abuse.[29]

## IV.     CAUSES OF ACTION
### COUNT ONE: NEGLIGENCE (Against All Defendants)

114.     Plaintiffs incorporate all consistent paragraphs of this Complaint as if fully set forth under this count.

115.     This cause of action is brought under New York law and Maine law, which are substantially similar with respect to the elements of a claim for negligence.

116.     Schools, seminaries, and religious homes that accept the care and custody of  are under a special duty of *in loco parentis*, which obligates them to exercise such care of their charges as a parent of ordinary prudence would observe in comparable circumstances.

117.     By virtue of assuming physical custody and control over students and effectively taking the place of parents and guardians, schools must adequately supervise the students in their charge, and they will be held liable for foreseeable injuries proximately related to the absence of adequate

---

[28] *Id.*
[29] *Id.*

supervision—this especially holds true for boarding schools and orphanages, where minors are living on the premises.

118.   The Fall River Diocese and Congregation of the Sacred Hearts owed students at Sacred Hearts Academy a duty to care for them and to stand in the shoes of their parents.

119.   The Fall River Diocese and the Grey Nuns were likewise under a special duty of *in loco parentis*, which obligated them to care for minors on the premises of St. Joseph's Orphanage in their care as a parent of ordinary prudence would observe in comparable circumstances.

120.   The Oblates advertised their seminaries and retreat homes as safe spaces for minors and knowingly had minor seminary students on their premises, thus, they similarly owed minors a duty to care for them, and to protect them from foreseeable harms.

121.   At all relevant times herein, Defendants held their institutions out to be safe places for religious worship, spiritual development and growth, learning and education, and engaging in youth and/or community activities.

122.   At all relevant times herein, Defendants held its nuns and priests named herein to be spiritual guides and educators fit for supervising young children, like Plaintiffs.

123.   Defendants accepted responsibility for the well-being of Plaintiffs as minor children.

124.   Defendants explicitly and implicitly represented to Plaintiff, their parents, and the community, that all of their educators and staff members were benevolent and trustworthy stewards of the faith who would only act in the best interests of the children whom they served; Defendants breached this duty by allowing known pedophiles access to Plaintiffs on their premises.

125.   Defendants had and/or assumed a duty to provide a reasonably safe environment for

Plaintiffs and assumed the duty to protect and care for them.

126.    Pursuant to common law and the Restatement (Second) of Agency, § 219, the priests and nuns named herein were acting as Defendants' agents and within the course and scope of their employment when the wrongful acts against Plaintiffs described herein were committed; they were acting as spiritual guides and educators of Plaintiffs, only able to sexually abuse Plaintiffs because of their job-created authority.

127.    As such, Defendants are vicariously liable for the acts of their clergy members through the doctrine of *respondeat superior,* in addition to their direct liability described here and below.

128.    Defendants knew, or should have known, that there was an unreasonable risk of harm to children in the care of Sacred Hearts Academy and St. Joseph's Orphanage, to whom pedophile priests were provided access by Defendants.

129.    Defendants knew that the Catholic schools and the Roman Catholic Church generally had a long history of employees and/or agents who had sexually molested children.

130.    Defendants created a foreseeable risk of harm to Plaintiffs—who were foreseeable victims as boarding school students and minor parishioners entrusted to Defendants' educators and spiritual leaders on Defendants' premises.

131.    Defendants owed a duty of care to all minor persons, including Plaintiffs, who were likely to come within the influence or supervision of their nuns and priests in their roles as spiritual guides, educators, employees, agents, and/or servants.

132.    Pursuant to Restatement (Second) of Torts, § 317, Defendants had a duty, as masters of the nuns and priests named herein, to exercise reasonable care to control them while acting as spiritual guides and transporting minors to, from, and throughout the State of New York, during which time

sexual offenses were committed against Plaintiffs.

133.    Defendants also had a duty to exercise reasonable care to control the nuns and priests on premises within their control and the accompanying grounds, even when acting outside the scope of their employment, and to prevent them from intentionally harming others, including Plaintiffs.

134.    Defendants accepted responsibility for Plaintiffs' care and well-being, while on their premises and under the direction and control of their educators and spiritual leaders.

135.    As such, Defendants had a duty to provide the type of care required of one who requests to be entrusted with the responsibility of caring for children.

136.    Defendants owed duties to Plaintiffs arising from the relationship akin or that of a child-parent/guardian, student-school, and/or parishioner-priest, and thus, Defendants were required and obligated to protect the children under their tutelage, including Plaintiffs.

137.    Such duties include, but are not limited to, a duty to provide safe care, custody and control of minor children, including Plaintiffs, a duty to warn of and report to the proper authorities the deviant propensities of their clergy members, and ultimately to prevent sexual, physical, and mental abuse of all minors within their care, control and/or custody, including Plaintiffs.

138.    The forcible sexual acts committed against Plaintiffs were performed in the course and scope of duties and authority delegated to the nuns and priests described herein by Defendants.

139.    Defendants, their agents, employees, servants and licensees—including vicariously through the priests and nuns named herein—breached their duties of care owed to Plaintiffs; including, *inter alia:*

      a.    failing to investigate their background and/or history before placing them into close contact with minors, including Plaintiffs;

b.      failing to warn Plaintiffs and their parents of sexual misconduct committed by their clergy and/or the reasonably foreseeable risk of future harm, despite Defendants having actual or constructive knowledge their clergy members had sexually abusing children, having the propensity to sexually abuse children, and/or posing as a threat of sexual abuse to children;

c.      permitting and/or directing their clergy members to have private contact with then minor Plaintiffs, despite having constructive or actual knowledge of Father Porter and the Nuns sexually abusing children, having a propensity to sexually abuse children, and/or posing as a threat of sexual abuse to children;

d.      minimizing, ignoring and/or excusing the misconduct their clergy members as described herein, which allowed such conduct to continue;

e.      failing to provide a safe environment to Plaintiffs within the academies, orphanages, churches, residencies, and rectories that they operated and/or owned;

f.      failing to conduct a reasonable investigation of abuse complaints;

g.      failing to create, institute, and/or enforce rules, policies, procedures, and/or regulations to identify and/or prevent the sexual abuse of children;

h.      failing to create, institute, and/or enforce rules, policies, procedures, and/or regulations to prevent the sexual abuse of Plaintiffs; and

i.      failing to exercise reasonable care to control of their clergy members to prevent the sexual abuse of Plaintiffs in their custody and care, and on their premises.

140.    In the above ways, among others, Defendants failed to exercise the degree of care that a reasonably prudent person would have exercised under similar circumstances, thereby breaching

their duties owed to Plaintiffs.

141.    As a direct and proximate result of the above mentioned breaches of duty by Defendants and their agents, servants, employees and/or others for whose acts or omissions they are responsible, and those whose identities are in the exclusive control of Defendants, Plaintiffs experienced and suffered from sexual abuse at the hands of Defendants, as well as the ensuing physical, mental, and financial injuries and damages discussed herein, which Plaintiffs still suffer.

142.    As a direct and proximate result of Defendants' foregoing acts and omissions, as described herein, Plaintiffs sustained both physical and emotional injuries, including, humiliation, embarrassment, loss of self-esteem, disgrace, guilt and shame; loss of faith and mistrust of the education system, figures of authority, and the Roman Catholic Church's spiritual guides; injuries suffered at the time of the sexual abuse including physical pain and shock to the nervous system and emotional distress; severe mental anguish and trauma, necessitating psychiatric and medical care and treatment in the past, present and future; physical ailments, including, but not limited to grievous bodily pain and suffering, bleeding, headaches, nausea, mental anguish, anxiety and loss of sleep; and loss of earnings and earning capacity during those periods Plaintiffs were unable to work due to traumatization, and may in the future be unable to work.

143.    Defendants' acts and omissions were a foreseeable, direct, and proximate cause of Plaintiffs' resulting injuries and damages therefrom.

144.    By reason of the foregoing, Plaintiffs are entitled to recover all damages from Defendants.

### COUNT TWO: NEGLIGENT TRAINING/SUPERVISION/RETENTION
#### (Against All Defendants)

145.    Plaintiffs incorporate all prior paragraphs of this Complaint as if fully set forth herein.

146.    This cause of action is brought under New York law and Maine law, which are substantially similar with respect to the elements of a claim for negligent training, retention, and supervision. The priests and nuns named herein were employed by Defendants and were under Defendants' direct supervision, employment, and control when they committed the wrongful acts alleged; they engaged in the wrongful conduct while acting in the course and scope of their employment with Defendants and/or accomplished the sexual abuse by virtue of their job-created authority.

147.    Father Porter admitted he was able to sexually abuse over 100 children because he was "hiding behind the cloth."[30]

148.    Defendants, through their employees and agents, had a duty arising from their employment of the priests and nuns named herein, to ensure that they did not sexually molest and abuse children in their care and/or on their premises.

149.    Defendants owed a duty to train and educate employees and administrators and establish adequate and effective policies and procedures calculated to detect, prevent, and address inappropriate behavior and conduct between its employees and the children under their care.

150.    Defendants breached their duties to instruct, train and supervise their employees, in that Defendants failed to exercise the degree of care that a reasonably prudent person would have exercised under similar circumstances, including, *inter alia:*

   a.    failing to timely and properly educate, train, supervise, and/or monitor their agents or employees with regard to policies and procedures that should be followed when sexual abuse of a child is suspected or observed;

---

[30] *See* Exhibit 6.

b.      failing to timely and properly educate, train, supervise, and/or monitor their agents or employees with regard to policies and procedures that should be followed to detect and/or prevent sexual abuse of a child;

c.      failing to supervise, monitor, and/or investigate Father Porter and the Nuns in their interactions with children when Defendants knew or should have known that such supervision was necessary;

d.      failing to train employees on rules, policies, procedures, and/or regulations to prevent the sexual abuse of Plaintiffs;

e.      failing to properly supervise the priests and nuns named herein such that the opportunity for repeated, unfettered private access to Plaintiffs would not be available; and

f.      failing to take reasonable steps to remove known predators from the types of duties and circumstances which allowed them the opportunity to continue sexually abusing minors, including Plaintiffs.

151.   Defendants breached their legal duty of due care owed to Plaintiffs as boarding students of Sacred Hearts Academy entrusted in their care, custody, and supervision.

152.   Defendants breached their duty in failing to adequately evaluate, and qualify the priests and nuns named herein, both pre- and post-hiring, and failed to monitor, supervise, influence, control, discipline, or discharge and/or report abusive priests and nuns to criminal authorities and/or parents or otherwise restrict their movement and/or activities to ensure the safety of the children of Sacred Hearts Academy, specifically Plaintiffs, in the ways discussed herein.

153.   Defendants and their agents and/or employees, knew, or should have known, of the priests and nuns named herein deviant sexual proclivities, propensities, and/or criminal misconduct prior

to employing or placing them in positions of trust with minors.

154.    Unfortunately, Defendants placed and maintained the priests and nuns named herein in positions of trust and control with access to children, which ultimately allowed them to access and harm Plaintiffs.

155.    After placing the priests and nuns named herein, even with knowledge of abuse sustained by Plaintiffs, they then negligently retained them in positions where they had access to children and could foreseeably cause harm which Plaintiffs would not have been subjected to had Defendants exercised reasonable care.

156.    In failing to timely remove the abusive priests and nuns named herein from working with children, Defendants failed to exercise the degree of care that a reasonably prudent person would have exercised under similar circumstances.

157.    As a direct and proximate result of the foregoing acts and omissions by Defendants, Plaintiffs sustained serious injuries, as described above.

158.    Defendants' acts and omissions were a foreseeable, direct, and proximate cause of Plaintiffs' resulting injuries and damages therefrom.

159.    By reason of the foregoing, Plaintiffs are entitled to recover all damages from Defendants.

### COUNT THREE: GROSS NEGLIGENCE/PUNITIVE DAMAGES (Against All Defendants)

160.    Plaintiffs incorporate all prior paragraphs of this Complaint as if fully set forth herein.

161.    This cause of action is brought under New York law and Maine law, which are substantially similar with respect to the elements of a claim for gross negligence and punitive damages.

162.    "Gross negligence is conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *C.Q. v. Estate of Rockefeller*, No. 20-CV-2205 (VSB), 2021

WL 4942802, at *8 (quoting *Am. Tel. & Tel. Co. v. City of New York*, 83 F.3d 549, 556) (2d Cir. 1996); see also *Reliance Nat'l Indem. v. Knowles Indus. Services, Corp.*, 868 A.2d 220, 226 (Me. 2005).

163.    "Recklessness in the context of a gross negligence claim means an extreme departure from the standards of ordinary care, such that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (quoting *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 61 (2d Cir. 2012)).

164.    Defendants' conduct unquestionably smacks of intentional wrongdoing.

165.    The Fall River Diocese was aware Fr. Porter had sexually assaulted minors in the past and posed a threat to minors in the Diocese's schools, orphanages, and parishes and throughout the greater community; instead of removing Fr. Porter from ministry, the Fall River Diocese intentionally sent Father Porter out of Massachusetts to receive "treatment," and then allowed Fr. Porter unfettered access to children when he returned.

166.    Priests and nuns of the Congregation of the Sacred Hearts and the Grey Nuns recklessly disregarded the wellbeing of minors at Sacred Hearts Academy and St. Joseph's Orphanage.

167.    The Oblates also recklessly disregarded threats to minors within its retreat homes and seminaries, and the Order routinely shuffled priests throughout the Northeast at alarming rates.

168.    Defendants' acts and omissions, thus, were committed with reckless disregard for, and with willful, wanton, and conscious indifference to, the rights, safety, and welfare of children and the general public.

169.    The nature of Defendants' aforesaid wrongful acts and omissions were of such a nature as to constitute gross negligence and malice.

170.    Defendants undertook a continuous course of action in the form of conscious decisions,

with subjective knowledge and awareness of the risks and hazards presented by each decision as discussed above and incorporated herein, to expose Plaintiffs and other minors to sexual abuse, without exercising slight care or diligence.

171.   Defendants had a duty to exercise reasonable care in relation to the safety and welfare of their minor students and parishioners, including Plaintiffs.

172.   Defendants had a duty to exercise reasonable care to avoid creating or maintaining unreasonable risks to the safety and welfare of the children enrolled in their school, including Plaintiffs.

173.   Defendants had a duty to exercise reasonable care in investigating and pursuing complaints of criminal conduct, sexual misconduct, and violations of law against the children enrolled in their school, including Plaintiffs.

174.   Upon information and belief, complaints were made and it was known to Defendants' leaders, agents, and employees that Sacred Hearts Academy boarding students, including Plaintiffs, were being sexually abused; by the time Jane Doe 1 completed eighth grade, there were only six students in her graduating class.

175.   Without warning, Sacred Hearts Academy closed the following year, which is when Plaintiffs left Fairhaven and were sent back to Brooklyn, New York where they finished their academic studies.

176.   In addition to the common law duty of ordinary care discussed above, and incorporated herein, Defendants also had a duty that arose because of, *inter alia,* a special relationship between the school and the minor students attending the school.

177.   Defendants agreed to board, educate, care for, and keep safe the minor students in exchange for tuition, which Defendants accepted to fund and promote their school and initiatives.

178.    Defendants breached their duty of care by acting with reckless disregard of the safety and welfare of Plaintiffs and other innocent children by failing to properly investigate and report the known and tolerated pedophile activities of their educators/religious leaders, including those of Father Porter and the Nuns, and by placing its own personal interest in front of the safety of the children enrolled in their school, including Plaintiffs.

179.    Defendants were more concerned with their reputations than protecting children, including Plaintiffs. Such conduct was, and is, wanton and willful, reckless, and conscious disregard of the safety of innocent children, including Plaintiffs.

180.    Defendants' foregoing acts and omissions, involved reckless disregard of or indifference to an extreme degree of physical, mental, and psychological risk and danger, considering the probability and the magnitude of the potential harm to others.

181.    Defendants' foregoing gross negligence was a foreseeable, direct, and proximate cause of the occurrence and Plaintiffs' injuries and damages therefrom.

182.    As a direct and proximate result of the Defendants' acts and omissions, Plaintiffs suffered sexual abuse at the hands of Defendants' priests and nuns, as well as the ensuing physical, mental, and financial injuries and damages discussed herein, which Plaintiffs continue to suffer, and Plaintiffs are entitled to recover their damages from Defendants.

<u>**COUNT FOUR: PREMISES LIABILITY (Against All Defendants)**</u>

183.    Plaintiffs incorporate all prior paragraphs of this Complaint as if fully set forth herein.

184.    This cause of action is brought under New York law and Maine law, which are substantially similar with respect to the elements of a claim for premises liability.

185.    At all relevant times, Defendants owned, occupied, and controlled the premises described herein upon which Plaintiffs were sexually abused.

186.    Defendants provided inadequate security and supervision over the premises despite the existence of unreasonable risk of harm from abusive personnel at these premises.

187.    At all relevant times, Plaintiffs were invitees on the academy, orphanage, seminary, parish, and retreat and clergy residences where they were assaulted.

188.    The risk of harm was foreseeable, and Defendants knew or had reason to know that abuse of minors would occur given previous abuse, proximity of other abuse, the recency of other abuse, frequency of abuse, the similarity of other abuse, and their actual knowledge of this abuse by educators, spiritual guides, and other personnel Defendants' academies, orphanages, seminaries, parishes, retreat and clergy residences.

189.    The above acts and omissions by Defendants were a proximate cause of Plaintiffs' injuries and the resulting damages Plaintiffs seek in this suit.

### COUNT FIVE: BREACH OF FIDUCIARY DUTY
### (Against Fall River Diocese and Congregation of Sacred Hearts)

190.    Plaintiffs incorporate all prior paragraphs of this Complaint as if fully set forth herein.

191.    This cause of action is brought under New York law and Maine law, which are substantially similar with respect to the elements of a claim for breach of fiduciary duty.

192.    Plaintiffs were minors at all relevant times, and Defendants and their agents and employees were acting *in loco parentis* in charge of Plaintiffs' wellbeing.

193.    At all relevant times, Plaintiffs had a special relationship with Defendants, as they were boarding school students at an academy owned, maintained, controlled, and supervised by the Fall River Diocese and the Congregation of the Sacred Hearts.

194.   This relationship was rooted in a moral, social, religious, or personal relationship of trust and confidence between Plaintiffs and the Fall River Diocese and Congregation of the Sacred Hearts.

195.   Defendants had a dominance over Plaintiffs, who were dependent on their control and Plaintiffs reasonably relied on leaders, employees, and agents from the Fall River Diocese and the Congregation of the Sacred Hearts to act in their best interest.

196.   This special relationship gave rise to a fiduciary relationship.

197.   Further, at all relevant times, Jane Doe 1 and Jane Doe 2 had a special relationship with Sacred Hearts Academy, and its leaders, employees, and agents, arising from the academy's status as an educational and religious institution.

198.   Entrusted with special privileges and immunities, the Fall River Diocese and Sacred Hearts Academy demanded complete loyalty, fealty, and trust from individuals like Jane Doe 1 and Jane Doe 2 and specifically instructed individuals like them, such that they are granted with special power to determine right and wrong.

199.   Jane Doe 1 and Jane Doe 2 were taught that they must adhere to the teachings and instructions of their teachers and spiritual guides, and the failure to do so will result not just in discipline but also an offense against God.

200.   This extreme power imbalance mandates that individuals like Jane Doe 1 and Jane Doe 2 place an extreme degree of trust and confidence in the nuns and priests from the Fall River Diocese and the Congregation of the Sacred Hearts to determine what is in the best interest of individuals like them.

201.    This psychological power over Plaintiffs caused them to justifiably and indeed mandated that they rely on the commands of the Fall River Diocese and the Congregation of the Sacred Hearts, by and through their employees, educators, and spiritual leaders.

202.    Given the existence of their status as fiduciaries over Jane Doe 1 and Jane Doe 2, the Fall River Diocese and the Congregation of the Sacred Hearts owed them the highest duty of care at law, including but not limited to: (1) duty of loyalty and utmost good faith; (2) duty of candor; and (3) duty to act with integrity of the strictest kind; and (4) duty of full disclosure.

203.    The Fall River Diocese and the Congregation of the Sacred Hearts breached their fiduciary duties by, among others, hiding and keeping secret the fact that there were persons at the school to whom Jane Doe 1 and Jane Doe 2 would be subjected that engaged in sexual abuse of minors; by failing to disclose both before and after the events at issue in this case; their knowledge of the abuse and the abuser; by failing to disclose the policy of covering-up past incidents of abuse, and putting their interests ahead of students and victims like Jane Doe 1 and Jane Doe 2.

204.    These breaches caused harm to Jane Doe 1 and Jane Doe 2 and other student victims like them and benefitted the Fall River Diocese and the Congregation of the Sacred Hearts—who sought to protect their reputation from public knowledge of the rampant misconduct occurring at its institutions.

205.    The above acts and omissions by Defendants were a proximate cause of Plaintiffs' injuries and the resulting damages Plaintiffs seek in this suit.

## V.      PRAYER FOR RELIEF & JURY DEMAND

206.    WHEREFORE, Plaintiffs pray for the following relief against Defendants:

   a.   for Plaintiffs' general and special damages in an amount to be proven at trial by jury;

   b.   for Plaintiffs' incurred costs together with interest at the highest lawful rate on the total amount of all sums awarded from the date of judgment until paid;

c.   for the fair and reasonable monetary value of Plaintiff's past, present, and future pain and suffering in an amount to be proven at trial by jury;

d.   for the medical expenses incurred up to the date of trial and any additional expenses necessary for future medical care and treatment;

e.   for economic damages in the form of out-of-pocket expenses, lost wage, earnings, employment opportunities, and other economic damages;

f.   for punitive damages or exemplary damages to be set by a jury in an amount sufficient to punish Defendants for their outrageous conduct and to discourage others from engaging in similar conduct in the future;

g.   for reasonable attorneys' fees and costs, court costs, and litigation expenses;

h.   for pre-judgment and post-judgment interest pursuant to 28 U.S.C. § 1961 and any other applicable law or statute; and other litigation expenses; and

i.   for such other and further relief as this Court may deem just and proper.

207.    Plaintiffs demand a trial by jury on all issues so triable.

Respectfully Submitted,


By:   /s/ Rob Rickner
Rob Rickner
Rickner PLLC
14 Wall Street, Suite 1603
New York, New York 11238
Phone: (212) 300-6506
Fax: (888) 390-5401
*Attorney for Plaintiff*

*/s/ Darren Wolf*
Darren Wolf*
Texas State Bar No. 24072430
darren@darrenwolf.com
Ashley Pileika
New York Bar No. 974605

**Law Office of Darren Wolf, P.C.**
1701 N. Market St., Suite 210
Dallas, Texas 75202
P:  214-346-5355
F:  214-346-5909
*Pro hac vice motion to be filed*